## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| SHIRLEY MOREFIELD, Derivatively and on Behalf of Nominal Defendant COMPUTER SCIENCES CORPORATION,<br><br>       Plaintiff,<br><br>       v.<br><br>IRVING W. BAILEY, II, DAVID J. BARRAM, STEPHEN L. BAUM, RODNEY F. CHASE, JUDITH R. HABERKORN, MICHAEL W. LAPHEN, MICHAEL J. MANCUSO, F. WARREN MCFARLAN, CHONG SUP PARK, THOMAS H. PATRICK,<br><br>       Defendants,<br><br>   and<br><br>COMPUTER SCIENCES CORPORATION,<br><br>       Nominal Defendant. | Case No. _/ : 12 cv 1468_<br><br>_GBL / TCB_ |

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Shirley Morefield ("Plaintiff"), by the undersigned attorneys, submit this Verified Shareholder Derivative Complaint against the defendants named herein.

### NATURE OF THE ACTION

1.     This is a stockholder derivative action brought by Plaintiff on behalf of nominal defendant Computer Sciences Corporation ("CSC" or the "Company") against certain of CSC's current and former directors and officers (the "Individual Defendants"). Plaintiff, by the undersigned attorneys, allege upon personal knowledge with respect to herself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, the pleadings and other documents in the action entitled *In re Computer Sciences*

*Corporation Securities Litigation*, Case No. 1:11cv610-TSE-IDD (E.D.Va.) (the "Class Action"), and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein.

2.     This action concerns the Individual Defendants' (as defined herein) breaches of fiduciary duty in connection with the issuance of years of materially false and misleading statements concerning the Company's $5.4 billion contract with the United Kingdom's National Health Service ("NHS"), the adequacy of CSC's internal controls over financial reporting, and the Company's operations in its European Nordic region.

3.     The Individual Defendants' misconduct was first revealed on November 10, 2010, when CSC announced it discovered certain accounting irregularities in the Nordic region.  These irregularities purportedly would require a $40 million charge to the Company, yet the Individual Defendants caused the Company to assure stockholders that all was well—the problem had been contained.  As the Individual Defendants were aware, this was not true.

4.     Between February 2011 and June 2011, CSC issued a series of announcements in which the Company substantially decreased its historical and projected financial performance, and disclosed that the Company's previously reported accounting irregularities were far worse than originally disclosed.  The Company made the first of these announcements on February 1, 2011.  This announcement also disclosed that the U.S. Securities and Exchange Commission ("SEC") had commenced a formal investigation into the Company's accounting practices.

5.     Only eight days later, on February 9, 2011, the Company announced that its previously-identified accounting irregularities would result in an *$80 million* charge to CSC, more than double previously reported.  Yet this was not the only bad news.  The Company also announced that the UK government had threatened to terminate CSC's multi-billion contract

with the NHS (the "NHS Contract") due to CSC's inability to complete the project on time. Furthermore, CSC's revenue from the NHS Contract had fallen short by at least $175 million as a result of CSC's failure to meet the Pennine Care NHS Foundation Trust ("Pennine Trust") milestone. The NHS Contract was a critical contract for CSC, and its failure to deliver on such a high-profile contract not only substantially impaired CSC's revenue stream, but its business reputation as well.

6.      On May 2, 2011, the Company disclosed that bookings for fiscal year 2011 would be reduced by an additional $2 billion. Thus, in the span of just a few months, CSC reduced its total 2011 bookings by *$4.5 billion*.

7.      Following the public disclosure of these failures, on May 25, 2011, CSC announced that the audit committee (the "Audit Committee") of the CSC board of directors (the "Board') had commenced an investigation into the Company's accounting irregularities. This investigation revealed even more accounting issues and prompted an announcement that the Company's annual report on Form 10-K for the 2011 fiscal year would be delayed as a result of material weaknesses in the Company's internal controls. The Company also announced dramatically lower earnings for the year which, for the first time, were acknowledged to be caused in part by the Company's internal control deficiencies and the failures with regard to the NHS Contract.

8.      On June 15, 2011, the Company finally filed its 2011 annual report in which it revealed that the accounting irregularities had yet again increased, to $91 million for fiscal 2011. These charges were, according to the Company, a result of "intentional misconduct" by executives in the Company's Nordic region, and the Company further admitted that the accounting irregularities were identified as early as April 2010, more than six months before the

Company indicated to shareholders that such issues may exist. Nonetheless, the Individual Defendants and the Company told shareholders that the Company maintained adequate internal controls.

9.    Not only were the Individual Defendants aware of the accounting irregularities, they were also aware as early as 2008 that the Company would not be able to meet its NHS Contract deadlines. Indeed, as early as April 2008 an internal team of experts determined that the Company could not meet its NHS Contract deadlines, and that the software upon which the project was based was undeliverable. Notwithstanding this material non-public knowledge, the Individual Defendants continued to assure shareholders that CSC was on track with the NHS Contract.

10.    In August 2012, the court presiding over the Class Action determined that the plaintiffs there adequately pled that the Company made materially false and misleading statements concerning the Company's internal controls and the NHS Contract, as alleged herein.

11.    The Individual Defendants' misconduct has caused substantial harm to the Company relating to, among other things, the costs of its internal investigations, the costs of complying with and defending against the SEC's investigation, and lost revenue.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interests and costs. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

13.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful

acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

14.     Plaintiff is a citizen of Kansas.  Plaintiff is a stockholder of CSC, was a stockholder of CSC at the time of the wrongdoing alleged herein, and has been a stockholder of CSC continuously since that time.

15.     Defendant Irving W. Bailey, II ("Bailey") is currently a director of CSC.  Bailey has served as a director of CSC since 1992.  He is a member of the Compensation Committee of the Board of Directors ("Board") of CSC.  Upon information and belief, Bailey is a citizen of Florida.

16.     Defendant David J. Barram ("Barram") is currently a director of CSC.  Barram has served as a director of CSC since 2004.  He is chairman of the Nominating and Corporate Governance Committee of the Board and has been a member of the Audit Committee of the Board since 2005.  Upon information and belief, Barram is a citizen of California.

17.     Defendant Stephen L. Baum ("Baum") is currently a director of CSC.  Baum has served as a director of CSC since 1999.  He is a member of the Nominating and Corporate Governance Committee and has been a member of the Audit Committee since 1999.  Upon information and belief, Baum is a citizen of New Hampshire.

18.     Defendant Rodney F. Chase ("Chase") is currently Chairman of the Board of CSC.  Chase has served as a director of CSC since 2001.  He is a member of the Executive Committee of the Board and was a member of the Audit Committee from 2002 to 2011.  Upon information and belief, Chase is a citizen of Florida.

19.     Defendant Judith R. Haberkorn ("Haberkorn") is currently a director of CSC. Haberkorn has served as a director of CSC since 2007. She is a member of the Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, Haberkorn is a citizen of Florida.

20.     Defendant Michael W. Laphen ("Laphen") is the former Chairman of the Board, President and Chief Executive Officer ("CEO") of CSC. Laphen served as Chairman of the Board, President and CEO from 2007 to March 19, 2012. Upon information and belief, Laphen is a citizen of Virginia.

21.     Defendant Michael J. Mancuso ("Mancuso") is the former Vice President and Chief Financial Officer ("CFO") of CSC. Mancuso served as Vice President and CFO of CSC from 2008 to May 29, 2012. Upon information and belief, Mancuso is a citizen of Florida.

22.     Defendant F. Warren McFarlan ("McFarlan") is a former director of CSC. McFarlan served as a director of CSC from 1989 to August 7, 2012. He was a member of the Compensation Committee and Nominating and Corporate Governance Committee. Upon information and belief, McFarlan is a citizen of Massachusetts.

23.     Defendant Chong Sup Park ("Park") is currently a director of CSC. Park has served as a director of CSC since 2007. He is chairman of the Compensation Committee. Upon information and belief, Park is a citizen of California.

24.     Defendant Thomas H. Patrick ("Patrick") is a former director of CSC. Patrick served as a director of CSC from 2004 to August 7, 2012. He was a member of the Audit Committee from 2004 to 2011. Upon information and belief, Patrick is a citizen of Florida.

25.     The defendants listed in paragraphs [6] to [16] may be referred to herein as the "Individual Defendants." Defendants Barram, Baum, Chase and Patrick may be referred to herein as the "Audit Committee Defendants."

26.     Nominal Defendant CSC is a Nevada Corporation with its principal place of business in Falls Church, Virginia, and thus is a citizen of Nevada and Virginia.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### *The Individual Defendants' Fiduciary Duties*

27.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, loyalty and candor, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

28.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

29.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

      a.      Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of their business;

      b.      Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority; and

      c.      Exercise good faith to ensure that the statements made to the public by the Individual Defendants, through the Company, were not materially false and/or misleading.

***Additional Duties of the Audit Committee Defendants***

30.     In addition to their duties as Board members, the Audit Committee Defendants possessed certain duties by virtue of their positions on the Audit Committee. These duties are set forth in the Audit Committee's charter (the "Audit Committee Charter").

31.     According to the Audit Committee Charter, the Audit Committee is responsible for "oversee[ing] the accounting, financial reporting processes and related internal control framework of the Company and audits of the Company's financial statements and internal controls over financial reporting."

32.     According to the Audit Committee Charter, the Audit Committee's responsibilities include to:

      a.      establish procedures for (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters, and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters;

b.      at least annually, … obtain and review a report by the independent auditor describing: the firm's internal quality-control procedures; any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm, and any steps taken to deal with any such issues; and (to assess the auditor's independence) all relationships between the independent auditor and the Company;

c.      review and discuss the Company's annual audited financial statements and quarterly financial statements with management and the independent auditor, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations.";

d.      discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;

e.      review with the independent auditor any audit problems (including any significant disagreements with management) or difficulties (including any restrictions on the scope of the independent auditor's activities or on access to requested information), and management's response; and

f.      review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or the performance of the internal audit function.

33.    The Audit Committee Charter further provides that the Audit Committee must

review:

a.      major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of the material control deficiencies;

b.      analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial

statements, including analyses of the effects of alternative GAAP methods on the financial statements;

c.     the effect of regulatory and accounting initiatives, as well as off balance sheet structures, on the financial statements of the Company; and

d.     the type and presentation of information to be included in earnings press releases (paying particular attention to any use of "pro forma," or "adjusted" non-GAAP, information), as well as review any financial information and earnings guidance provided to analysts and rating agencies.

34.     The Audit Committee is required to keep "regular minutes of its proceedings, including a copy of all actions by written consent, and the Chairman of the Committee shall report the same to the Board of Directors."

## SUBSTANTIVE ALLEGATIONS

*CSC's Operations Relevant to this Action*

### *The Managed Services Sector*

35.     During the relevant period, CSC provided information technology and business process outsourcing, consulting and systems integration services and other professional services to its customers. The Company operated within three sectors: North American Public Sector, Managed Services Sector ("MSS"), and Business Solutions and Services. The MSS segment provided large-scale outsourcing solutions offerings as well as midsize services delivery to customers globally. MSS was the Company's biggest segment.

### *Britain's National Health Services Contract*

36.     The NHS is the publicly funded healthcare system in the UK. Beginning in or about 2002, NHS sought to create a fully-integrated patient and medical records Information Technology ("IT") system throughout the UK.

37.     During fiscal 2004, the NHS entered into a $1.7 billion, 10 year IT agreement with CSC—the NHS Contract. The Company was to design, deliver and operate an integrated patient care record system, providing patients with a lifelong electronic care record.

38.     In fiscal 2005, CSC's Europe revenues increased $644 million, representing 17.5% growth, due in large part to the NHS Contract. Similarly, in fiscal 2006, the NHS Contract and one other European contract generated revenue growth of $184 million.

39.     CSC's largest commercial award during fiscal 2007 was a 9 year, $3.7 billion contract with the NHS. Under this agreement CSC assumed the role of primary contractor from Accenture Ltd. for two additional regions for the implementation of a record keeping system for the NHS.

*False and Misleading Statements*

40.     As discussed in greater detail below, the Individual Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and profitability during the Company's fiscal years 2009-2011. In particular, the Individual Defendants knowingly caused or allowed the Company to:

    a.      repeatedly assure shareholders that the NHS Contract "is currently profitable and the Company expects to recover its investment," when the Individual Defendants knew that was not true;

    b.      repeatedly assure shareholders that the Company's internal controls were adequate and effective, when the Individual Defendants knew that was not true;

    c.      report quarterly and annual financial results the Individual Defendants knew were materially inflated as a result of the Company's accounting improprieties and failure to fulfill the terms of the NHS Contract.

41.     The Individual Defendants knowingly caused or allowed the Company to issue the foregoing false and misleading statements in press releases, Form 10-Q filings, Form 10-K

filings, and conference calls from August 5, 2008 through August 11, 2010, including the following:

a.    August 5, 2008 press release and conference call;

b.    August 13, 2008 Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

c.    November 12, 2008 press release, conference call, and Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

d.    February 10, 2009 press release and conference call;

e.    February 11, 2009 Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

f.    May 20, 2009 press release and conference call;

g.    May 29, 2009 Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

h.    August 6, 2009 press release and conference call;

i.    August 7, 2009 Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

j.    November 11, 2009 press release and conference call;

k.    November 12, 2009 Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

l.    February 10, 2010 press release, conference call, and Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso;

m.    April 1, 2010 press release;

n.    May 20, 2010 press release and conference call;

o.    May 21, 2010 Form 10-K filing, which was signed by defendants Laphen, Mancuso, Bailey, Barram, Baum, Chase, Haberkorn, McFarlan, Park and Patrick; and

p.    August 11, 2010 press release and Form 10-Q filing, which was signed and certified by defendants Laphen and Mancuso.

*The Truth Emerges*

    *MSS*

    42.    On November 10, 2010, the Company filed with the SEC a Form 10-Q reporting its financial results for the second quarter of fiscal year 2011 (ended October 1, 2010). Therein, the Company disclosed that its MSS had "incurred various adjustments" amounting to approximately $30 million of charges in the second quarter and $40 million of charges in the first six months of fiscal 2011. These charges "resulted from accounting errors and the misapplication of internal accounting policies and U.S. GAAP, as well as from accounting irregularities in the Nordic region, principally affecting prepaid accounts and outsourcing contract costs."

    43.    The November 10, 2010 10-Q also disclosed that as a result of "identified deficiencies that aggregate to a material weakness in our internal control over financial reporting," the Company's internal controls and procedures were not effective as of October 1, 2010.

    44.    On an earnings call held that same day, defendant Mancuso assured investors that "[t]he good news is we found it [the accounting irregularities], fixed it, and put it behind us." Mancuso also stated: "As far as the other impacts, the Nordics was 40 plus million, 40ish was the problem there. Other than that, margins are intact. We don't have any other issues, under-performing business et cetera, et cetera."

    45.    Despite these assurances, on February 1, 2011, CSC disclosed that the SEC had initiated a formal civil investigation into the accounting irregularities at the Company's MSS segment. However, the Company did not provide any additional details except to state that it was cooperating with the investigation.

46.     On February 9, 2011, the Company filed with the SEC a Form 10-Q reporting its financial results for the third quarter of fiscal year 2011 (ended December 31, 2010), and therein revealed that the accounting irregularities were more than twice as large as it had previously disclosed. Despite Mancuso's previous statement that "we found it, fixed it, and put it behind us," the Company now disclosed that the accounting "irregularities" had more than doubled from a charge of $40 million to a charge of $81 million for the first nine months of fiscal 2011.

47.     As further detailed in the February 9, 2011 Form 10-Q: "The charges resulted from accounting irregularities in the Nordic region and to a lesser extent, from accounting errors and misapplication of U.S. GAAP in the Nordic region and other parts of MSS. These errors affected principally revenue, prepaid accounts, outsourcing contract costs, and other long-term liabilities." Additionally, the Company attributed "a majority of the Nordic region adjustments for the first nine months of fiscal 2011 to suspected intentional misconduct of certain former employees in our Danish subsidiaries." Finally, the Company stated that it had "initiated remediation of MSS oversight and monitoring controls, including account reconciliations, is continuing its review of the MSS Nordic business, and has initiated a forensic investigation" into the accounting irregularities. As expected, the Company admitted that its internal controls continued to be ineffective as of December 31, 2010.

48.     Also on February 9, 2011, CSC held an earnings conference call with investors and financial analysts. During the call, Mancuso refused to comment on the SEC investigation except to state that it was "ongoing." However, Mancuso did state that "we have taken the Nordics organization, its financial statements, and turned it literally upside down. We have with a very large team of in-house and out-of-house experts examined every contract that they are engaged with and every line item on the balance sheet. In addition to that, we have undertaken

-14-

an inquiry of our customers to determine whether or not there were commitments made to the customers or negotiations or agreements made that we are not aware of that have an impact on the financials that have not been book kept. It's a very thorough, exhaustive, lengthy process." Mancuso also stated that "the root causes have been fixed, the recovery is still in process in terms of exhausting all the detail. We are highly confident that we have most of the issues identified, but that's not to say that something won't pop which it did this quarter that we didn't anticipate."

49.    Mancuso continued to refuse to discuss the investigation and accounting irregularities during a May 25, 2011 conference call with investors, when he simply stated that "we can't comment, obviously, on the details of it, the progress of it, the length of it, it's not in our control. We're obviously cooperating, but the accounting reflects the best that we know at this point in time." Later in the conference call, a Morgan Stanley analyst asked Mancuso to confirm "whether or not the SEC or the Board's independent review has also expanded beyond the Nordic region as well?" In response Mancuso stated that he was "not in a position to be able to comment on the investigation." Subsequently, Mancuso was asked by another analyst: "in light of the Nordic region accounting irregularit[ies], have you conducted any extensive effort to scrub the accounting and margins on key contracts in other parts of the business just to make sure that some of those similar issues, like over-capitalization, aren't occurring elsewhere in the company?" Mancuso simply responded: "Of course we have, but I'm not going to comment on the details of the investigation or our efforts."

50.    Additionally, in a press release issued on May 25, 2011, CSC disclosed more disconcerting news, stating that it could not file its Form 10-K Annual Report before the May 31, 2011 deadline. Moreover, the Company announced an update to the investigation of the accounting irregularities, as follows:

As previously disclosed, in fiscal year 2011 the Company initiated an investigation into certain accounting errors in the Company's Managed Services Sector (MSS), primarily involving accounting irregularities in the Nordic region. Initially, the investigation was conducted by Company personnel, but outside Company counsel and forensic accountants retained by such counsel later assisted in the Company's investigation. On January 28, 2011, the Company was notified by the Division of Enforcement of the United States Securities and Exchange Commission (SEC) that the SEC had commenced a formal civil investigation relating to these matters, with which the Company is cooperating. On May 2, 2011, the Audit Committee of the Board of Directors commenced an independent investigation into matters relating to MSS and the Nordic region, matters identified by subpoenas issued by the SEC's Division of Enforcement and certain other accounting matters identified by the Audit Committee and retained independent counsel to represent CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with such independent investigation. Independent counsel has retained forensic accountants to assist their work. Independent counsel also represents CSC on behalf of, and under the exclusive direction of, the Audit Committee in connection with the investigation by the SEC's Division of Enforcement.

In addition, the SEC's Division of Corporation Finance has issued comment letters to the Company requesting additional information regarding its previously disclosed adjustments in connection with the above-referenced accounting errors, the Company's conclusions regarding such adjustments and the Company's analysis of the effectiveness of its disclosure controls and procedures and its internal control over financial reporting. The Company is responding to such comments.

51.     When CSC finally filed its Form 10-K on June 15, 2011, the Company revealed

that the accounting irregularities had yet again increased, to $91 million for fiscal 2011. As

further detailed in the Form 10-K:

During fiscal 2011, the Company recorded various pre-tax adjustments reducing income from continuing operations before taxes by $51 million ($34 million, net of taxes), that should have been recorded in prior fiscal years. As discussed below, these recorded adjustments comprised $91 million of charges reducing income from continuing operations before taxes originating out of the Company's MSS operations in the Nordic region, and $40 million of adjustments increasing income from continuing operations before taxes, principally out of other MSS businesses with $36 million of the $40 million within MSS. These adjustments reduced MSS operating income (a non-GAAP measure) by $53 million as discussed in Note 15, Segment and Geographic Information.

\*   \*   \*

As part of closing the Company's financial statements for the first quarter of fiscal 2011, management identified and recorded out of period charges totaling $21 million in its Nordic operations. In response to these errors, the Company made changes in operational and financial management and utilized experienced finance personnel from other business units and internal audit to assist with the closing of the Nordic financial statements for the second, third, and fourth quarters of fiscal 2011. As part of the quarterly closing procedures, the Company performed a detailed review of account reconciliations, customer contractual arrangements, labor agreements and employee benefit plans. As a result of these procedures, the Company recognized additional out of period pre-tax charges totaling $39 million, $25 million, and $6 million in the second, third, and fourth quarters, respectively.

\*   \*   \*

Based upon the Company's review of the underlying documentation for certain transactions and balances, review of contract documentation and discussions with Nordic personnel, the Company has attributed the majority of the $91 million of adjustments to accounting irregularities arising from suspected intentional misconduct by certain former employees in our Danish subsidiaries.

52.     The Company also announced that the material deficiencies resulting in the

irregularities and resulting adjustment were known as early as April 2010:

In connection with the preparation and filing of its Quarterly Reports on Form 10-Q for the periods ended October 1, 2010 and December 31, 2010, the Company concluded that a material weakness existed as of October 1, 2010 and December 31, 2010 due to the aggregation of a significant deficiency in the Nordic business (initially identified as of April 2, 2010, which continued to exist through the third quarter of fiscal 2011) and a deficiency in account reconciliation procedures and controls identified at other MSS business units during fiscal 2011. The Company concluded as of the end of October 1, 2010 and December 31, 2010 that individually these deficiencies were not material weaknesses. However, when they were considered in the aggregate, the Company concluded that there was a reasonable possibility that the Company's internal control over financial reporting could fail to prevent or detect a material misstatement of the Company's financial statements, and therefore that a material weakness existed as of each of these dates. The material change in internal control over financial reporting during the fourth quarter relates to the remediation of the material weakness.

53.     According to the Company's 1Q13 Form 10-Q, filed with the SEC on August 8, 2012, the Audit Committee "determined in August 2012 that its independent investigation is complete."

**The NHS Contract**

54.     On February 9, 2011, the Company filed with the SEC a Form 10-Q in which it finally disclosed the full extent of the problems with the NHS Contract. Therein, the Company disclosed the following:

> The Company's contract with the NHS to deliver an integrated electronic patient records system with an announced value of approximately $5.4 billion is a large and complex contract. In 2010, the NHS requested that the Company consider a reduction in contract value as a result of the U.K. government's national austerity program and, as a result, the Company held discussions with the customer on the NHS contract regarding potential modifications that are likely to reduce the scope of the work and total contract value. Total contract value, based on proposals submitted to the NHS, is currently estimated to be reduced between $800 to $950 million. The Company and the NHS are continuing in discussions; however, the parties have not reached final agreement as to any reduction in scope of the work or total contract value. On February 4, 2011, the NHS formally notified the Company that it believes the Company's failure to achieve a key milestone related to the Pennine Care NHS Foundation Trust implementation by January 28, 2011, constitutes a breach of contract and the NHS is considering its position on termination of all or parts of the contract...These modifications, if agreed, could result in a further reduction to total contract value in addition to the reduction described above.

55.     On May 2, 2011, the Company issued a press release in which it dramatically lowered its FY11 guidance. As compared to the February 9 projections, the Company reduced new business awards by *$2 billion*, revenue by $100 million, operating margin by between 30 and 80 basis points, and earnings per share by $0.45. The reduced guidance resulted from the Company's entry into a revised contract with NHS that substantially reduced the scope of the NHS Contract.

56.     Subsequently, on May 11, 2011, *Bloomberg* reported that UK Prime Minister David Cameron said the government would not sign any new contracts with CSC until reviews of missed deadlines on the system it was building for the Department of Health were completed. Cameron also stated: "We're absolutely determined to achieve better value for money," and that "[t]here are no plans to sign any new contracts with Computer Sciences Corp. until the National Audit Office report has been reviewed, and until the Public Accounts Committee meetings and major project authorization reviews have taken place." Further, Cameron stated that the government would "examine all the available options under the current contract, including the option of terminating some or indeed all of the contract."

57.     Finally, on August 3, 2011, *The Independent* reported that the NHS' "doomed IT system" was to "be abandoned by the Government after running up billions of pounds in bills." The article reported that the "nine-year-old NHS computer project - the biggest civilian IT scheme ever attempted - has been in disarray since it missed its first deadlines in 2007. The project has been beset by changing specifications, technical challenges and clashes with suppliers, which has left it years behind schedule and way over cost." Of particular interest, the article also noted that: "One supplier, Computer Sciences Corporation (CSC), has yet to deliver the bulk of the systems it is contracted to supply and has instead implemented a large number of interim systems as a stopgap." Additionally, the article reported that the Commons Public Accounts Committee had stated that "a huge amount of money had been wasted," and reported that the government was "involved in negotiations with contractors of the original scheme to claw back as much money from the contracts as possible."

*The Individual Defendants Knew of the Company's False and Misleading Statements and Deficient Internal Controls*

58.     The Individual Defendants knew that the statements set forth in paragraphs 41-42 herein were materially false and misleading when made. Indeed, as discussed herein, during the relevant period the Company conducted multiple high-level investigations into the MMS operations, the Company's internal controls, and the NHS Contract, and the results of these investigations were presented to the Individual Defendants on multiple occasions through reports, letters and other documents. In light of their knowledge of these investigations and reports which demonstrated the material weaknesses in the Company's operations, the Individual Defendants could not have in good conscience believed that the statements made concerning the Company's financial results, internal controls, and future business prospects were true. Indeed, as set forth below, the Individual Defendants, and especially the Audit Committee Defendants, who were responsible for the preparation and dissemination of the Company's financial reports and public statements, knew at the time that these statements were made that they were materially false and misleading.

*MSS and Internal Controls*

59.     The Individual Defendants, including the Audit Committee Defendants and defendant Laphen, were informed of the "significant deficiencies" in the Company's accounting operations more than two years prior to the Company's disclosure of a "material weakness" in the Company's internal control over financial reporting.

60.     As the Company admitted on June 15, 2011, account reconciliations constituted a significant deficiency both in the Company's Nordic operation and in other MSS regions. While the significant deficiency in account reconciliations in the Nordic region had been "initially

identified in April 2010," the Company did not disclose the "deterioration of the effectiveness of certain account reconciliations" until its November 10, 2010 Form 10-Q.

61.    However, the Audit Committee Defendants and defendant Laphen were actually on notice of these deficiencies as early as 2008. Accountants from MSS Europe Middle East and Africa ("EMEA") visited the Nordic region in May 2008. The accountants assessed the Nordic region's account reconciliations and determined that the Nordic region had significant accounting and internal control deficiencies. After a several-week review, the accountants prepared a "2008 EMEA-Nordic Report" detailing these deficiencies.

62.    The EMEA accountants identified that the Nordic region lacked sufficient support for the account balances to be able to properly and accurately assess the Nordic region's financial condition. Furthermore, the accountants concluded that the Nordic region lacked proper controls and procedures for conducting balance sheet account reconciliations, making it difficult to determine the accuracy of many account balances. Upon information and belief, the Audit Committee received the 2008 EMEA-Nordic Report in accordance with its obligations under the Audit Committee Charter.

63.    Separate and apart from the 2008 EMEA-Nordic Report, the Audit Committee was informed no later than September 2008 that the Company's internal auditing was "seriously compromised" and "pose[d] a significant risk both to CSC and its shareholders." This fact was communicated to certain of the Individual Defendants and the Audit Committee in a September 2, 2008 letter by the former Director of Internal Audit and Corporate Risk Management to defendant Chase, who is currently a member of the CSC Audit Committee and was a member of the Audit Committee in September 2008.

64.     The September 2, 2008 letter copied defendant Laphen, Vice President and Corporate Controller Donald G. DeBuck, and General Counsel and Secretary William Deckelman. The letter begins:

> Dear Mr. Chase,
>
> I want to share with you my concerns relative to the internal audit practice, where for the past three years I have served as the Director of Risk Management and America's Audit. During my tenure, I have been exposed to a number of audit issues that represented significant challenges to this firm, including: Project Pride, the Stock Option Inquiry, Tax Issues, CSCI, Restatements and as a member of the Delivery Assurance Red Team at NHS, to name but a few. *My belief is that the internal audit practice poses a significant risk both to CSC and its shareholders.* On several occasions I have voiced these concerns to the Chief Audit Executive (Scott Delanty). Issues raised and questions around loss of independence have gone unaddressed and I feel compelled to bring these issues to your attention.

65.     The letter went on to explain that the Internal Audit department had not maintained its requisite independence:

> I believe Scott Delanty [Chief Audit Executive] has *seriously compromised the integrity of the practice as well as the financials of this firm,* for the sake of personal relationships built up over his 18 year career with the firm. The point can be readily seen in that there has not been a significant finding in any audit report throughout his tenure; this despite the recent spate of issues raised by our external audit firm. *Said failures have cost this firm many millions of dollars.*

66.     The letter further highlighted several other areas of risk. For example, the letter stated that there had not been any financial audit of the NHS Contract or of controls over that "most visible and highest risk contract in CSC's portfolio."

67.     Moreover, the letter noted that the Internal Audit department had been barred from auditing almost half of CSC's revenues, and "there ha[d] not been a financial audit of the NPS business," which comprised 40% of CSC's annual revenue, for nearly three years:

> [T]he recent fine paid by CSC is yet another example of the expense CSC bears for not maintaining and monitoring adequate controls ... The reason

commonly given for the lack of audits in this space is that NPS has told Scott Delanty that Internal Audit is not welcome, a clear limitation in scope.

68.     Upon information and belief, the Company's Nordic region also was excluded from the annual internal audit plan for 2006 through 2008.

69.     The Audit Committee Charter required that the Audit Committee receive reports on internal controls, including the letter, and the Audit Committee was under a duty to bring these issues to the attention of the Board.  Thus, the Audit Committee and Board were on notice as of September 2008 that the Company had failed to maintain adequate internal controls and that the Internal Audit department was not performing an effective and independent review of the Company's financial reporting.  Upon information and belief, the Director of Internal Audit did not receive a response to his letter until July 2011, when outside consultant Navigant Consulting allegedly interviewed the director for three hours about all details of the letter.

### The NHS Contract and Internal Controls

70.     In early 2008, CSC's Board was on notice that the Company would be unable to meet its deadlines under the NHS Contract.

71.     At that time, the Board commissioned a review of the NHS Contract to be performed by the Delivery Assurance Review Red Team ("DA Red Team").  The DA Red Team traveled to the UK and India in April 2008 to assess the feasibility of satisfactorily performing on the NHS Contract.

72.     The DA Red Team spent two weeks in the UK extensively assessing the progress and projections related to the NHS Contract.  The team also visited India to assess the development of Lorenzo, the software on which the IT system was based.

73.     The Internal Audit Director served as the financial auditing expert on the DA Red Team.  Upon information and belief, the Internal Audit Director spent up to four weeks

-23-

reviewing the financial accounting elements of the NHS Contract and drafting portions of a report to the Board on the NHS Contract. According to the Internal Audit Director, the DA Red Team concluded that CSC "from a technology and operating perspective" could not perform the NHS Contract and the DA Red Team members all were "very consistent in [the] message that [CSC] could not meet our deadline. We could not deliver the solution set that we had contracted with NHS."

74.     According to the Internal Audit Director, "[c]osts were building up on the balance sheet and the project was behind schedule." The DA Red Team knew that the contract was a loser and CSC should have recognized a loss in 2008. The Internal Audit Director further believed that the financial records for the entire project were "very murky at best," and reported a far more optimistic view of the degree of completion on the contract than was supported by the actual progress on the program.

75.     Upon information and belief, the results of the DA Red Team review were presented to the Board in May 2008.

76.     In September 2008, the Company assembled another Delivery Assurance Review Team and sent it to England to assess the development and testing of Lorenzo ("Testing Review Team"). In mid-September 2008, the Testing Review Team met with the Deputy Head of Testing for Lorenzo, who told the Testing Review Team that the level of testing and test results for Lorenzo were "abysmal," that the defects in every release of Lorenzo were "high and grossly beyond" what the NHS would accept, and that the various releases on which the project was based could not be delivered on time.

77.     Shortly before his retirement in April 2011, the Deputy Head of Testing sent an e-mail to defendant Laphen, copying other CSC executives, in which he stated:

You hope that you will succeed by August 2011. I do too but you won't. The project is on a death-march where almost as many defects are being introduced as are being fixed. Look at the defect reports.

78. Despite this knowledge, the Individual Defendants knowingly caused or allowed the Company to repeatedly tout the success of the NHS Contract, as alleged herein. For example, on November 12, 2008, when analysts asked about missed deadlines, defendant Laphen stated, "[o]ur confidence continues to build on the program. We are pleased with our progress." Similarly, Laphen informed investors on February 10, 2009 that CSC was "on target" to meet key milestones in the fourth quarter of 2009. Moreover, in each of their quarterly filings with the SEC during the relevant period, the Individual Defendants knowingly caused or allowed the Company to claim that the NHS Contract was profitable and the Company expected to recover its investment.

79. Ultimately, CSC's incapacity to deliver on the NHS Contract caused Pennine Trust to withdraw from the program, and the NHS to accuse CSC of breach of contract and weigh complete termination of the contract. The Pennine Trust withdrawal, along with other missed milestones, resulted in the immediate cancellation of at least $175 million in revenue to CSC, resulting in missed revenue expectations. Indeed, the NHS Contract, once valued at $5.4 billion, was written down 37% to $3.4 billion as of June 15, 2011. The contract may in fact be totally worthless.

80. CSC's failure to deliver on the NHS Contract also sparked a UK. Parliamentary investigation, which revealed the fact that the Individual Defendants and the Company knew that CSC was incapable of delivering on the contract by August 2008, if not earlier.

*Denial of the Motion to Dismiss the Class Action*

81. The Class Action contains substantially similar allegations as contained herein,

namely, that the defendants named therein violated the federal securities laws by knowingly
disseminating the materially false and misleading statements alleged herein.

82.     On August 29, 2012, the Honorable T.S. Ellis, III of the United States District
Court for the Eastern District of Virginia granted in part and denied in part defendants' motion to
dismiss the Class Action. Specifically, Judge Ellis held that the plaintiffs in the Class Action had
adequately pled that CSC and certain of its officers made materially false and misleading
statements concerning the NHS Contract and the corporation's internal controls.

<h2 align="center">DERIVATIVE AND DEMAND ALLEGATIONS</h2>

83.     Plaintiff brings this action derivatively in the right and for the benefit of the
Company to redress the Individual Defendants' breaches of fiduciary duties.

84.     Plaintiff is a shareholder of CSC, was a shareholder of CSC at the time of the
wrongdoing alleged herein, and has been a shareholder of CSC continuously since that time.

85.     Plaintiff will adequately and fairly represent the interests of the Company and its
shareholders in enforcing and prosecuting its rights.

86.     On September 19, 2011, Plaintiff made a demand on the Board to commence this
action (the "Demand"). A copy of the Demand is attached hereto as Exhibit A. Plaintiff asserted
in the Demand that the Individual Defendants, and particularly the members of the Audit
Committee, breached their fiduciary duties of loyalty and good faith by (i) knowingly approving
the Company's accounting and financial reporting improprieties; (ii) abdicating their
responsibility to make a good faith effort to oversee the Company's operations, internal controls,
and accounting and financial reporting practices; and (iii) knowingly disseminating false and
misleading information regarding CSC's financial condition and business prospects, including
(a) falsely reporting financial results from the Company's MSS unit, which were incorporated

-26-

into the Company's consolidated financial statements, in violation of the Company's internal accounting policies and Generally Accepted Accounting Principles ("GAAP"); (b) failing to disclose that the implementation of the Company's software at the NHS was experiencing severe technical difficulties, rendering the Company unable to meet its customer contract milestones such that the entirety of the contract was at risk of termination; and (c) falsely disclosing that the Company had adequate internal and financial controls when in fact it did not. Plaintiff further asserted that as a result of these breaches of fiduciary duty CSC has sustained damages, including, but not limited to, the costs and expenses incurred in connection with the Company's Audit Committee inquiry and the SEC investigation. Accordingly, Plaintiff demanded that the Board take action to recover from the Individual Defendants the amount of damages sustained by the Company as a result of the misconduct alleged herein and to correct the deficiencies in the Company's internal controls and accounting and financial reporting practices that allowed the misconduct to occur.

87. On October 5, 2011, counsel for Defendants sent a letter requesting proof of Plaintiff's ownership of CSC common stock. A true and correct copy of this letter is attached hereto as Exhibit B.

88. On October 31, 2011, Plaintiff's counsel sent a letter to Defendants' counsel enclosing proof of Plaintiff's ownership of CSC common stock. A true and correct copy of this letter is attached hereto as Exhibit C.

89. On November 1, 2011, Defendants' counsel sent a letter to Plaintiff's counsel advising that "CSC's Board has determined to refuse the Demand at this time." The letter stated that "much more likely will be known in the future concerning the events underlying the Demand, as the Federal Securities Action, the SEC Investigation and the Audit Committee's own

internal independent investigation proceed." A true and correct copy of this letter is attached hereto as Exhibit D.

90.     On September 25, 2012, Plaintiff's counsel sent a letter to Defendants' counsel demanding that the CSC Board of Directors reevaluate its determination to refuse the Demand in light of Judge Ellis's opinion in the Class Action. The letter further requested that CSC promptly provide an update on the status of the Audit Committee's investigation into the events underlying the Demand. A true and correct copy of this letter is attached hereto as Exhibit E.

91.     On October 31, 2012, Defendants' counsel sent a letter to Plaintiff's counsel reiterating the Board's refusal of the Demand. A true and correct copy of this letter is attached hereto as Exhibit F.

92.     The Board's repeated refusal of the Demand was wrongful and improper. The Board refused Plaintiff's Demand in November 2011, more than a year ago, because the Board purportedly needed to collect additional information concerning the events underlying the Demands, such as the Class Action and the Audit Committee's investigation. However, it appears that the Board has not conducted any additional review of the facts it stated would inform its opinion as to Plaintiff's Demand. In August 2012, the Audit Committee purportedly concluded its investigation and defendants' motion to dismiss the Class Action was denied. Accordingly, Plaintiff renewed her Demand by letter dated September 25, 2012. The Board again refused Plaintiff's demand, citing the purported "reality that more will be known concerning the claims sought in the demand." The Board's responses to Plaintiff's Demand demonstrate that the Board has failed to undertake a good faith investigation of Plaintiff's Demand and respond to it in the best interests of the Company. Instead, the Board continues to delay action in response to the Demand, repeatedly citing the development of future facts as its

purported basis. The Board's failure to investigate and meaningfully respond to Plaintiff's Demand cannot be considered to have been in good faith.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

93. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

94. Each of the Individual Defendants was a director and/or officer of CSC during the relevant period. Accordingly, each of the Individual Defendants owed the Company the utmost duties of good faith and loyalty.

95. The Individual Defendants breached these fiduciary duties by knowingly disseminating to the public materially false and misleading statements concerning the Company's financial results and internal controls, as alleged herein.

96. The Individual Defendants further breached these fiduciary duties by knowingly failing to ensure that the Company maintained adequate controls over its internal accounting and auditing functions, financial reporting obligations, and business operations.

97. By reason of the Individual Defendants' breaches of fiduciary duties, the Company has sustained and will continue to sustain damages, as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.   Granting appropriate equitable relief to remedy the Individual Defendants' breaches of fiduciary duties;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accounts' and experts' fees, costs, and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: December 20, 2012

Mark Hanna (VA Bar No. 45442)
Michelle L. Woolley (VA Bar No. 81571)
**MURPHY ANDERSON PLLC**
1701 K Street, NW, Suite 210
Washington, DC 20006
Telephone: (202) 223-2620
Facsimile: (202) 223-8651

**KESSLER TOPAZ MELTZER
   & CHECK, LLP**
Eric L. Zagar
James H. Miller
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiff*