IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

SHIRLEY MOREFIELD, *derivatively and on behalf of Nominal Defendant Computer Sciences Corp.*,

Plaintiff,

v.

IRVING W. BAILEY, *et al.*,

Defendants,

COMPUTER SCIENCES CORP.,

Nominal Defendant.

Case No. 1:12-cv-1468 (GBL/TCB)

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on Defendants' Motion to Dismiss for failure to comply with Rule 23.1's shareholder derivative demand requirement and Motion to Dismiss for failure to state a claim. (Docs. 40, 43.) This case concerns the activities of a Nevada corporation's board of directors ("the Board") in connection with their management decisions and public statements related to the company's major contract with the United Kingdom's healthcare system. Plaintiff Shirley Morefield brings this action, alleging one count of breach of fiduciary duty on the grounds of deception and mismanagement by the board of directors. The present Motions present two issues before the Court.

The first issue is whether Plaintiff sufficiently pleaded with particularity that the Board wrongfully refused her demand to sue itself on behalf of the corporation. The Court holds that Plaintiff fails to plead wrongful refusal with particularity as required by Federal Rule of Civil Procedure 23.1. The Board's refusal of Plaintiff's demand to sue certain corporate officers indicated various reasons considered by the Board for its refusal to take her suggested course of

action. In light of the refusal letter and the facts available to the Board as a result of an internal investigation, a governmental investigation, and federal securities litigation, Plaintiff fails to allege facts that would sufficiently rebut the presumption that the Board's actions are protected by the business judgment rule. Accordingly, the Amended Complaint is subject to dismissal for this reason.

The second issue is whether, assuming the demand requirement was met, Plaintiff sufficiently states a claim for breach of fiduciary duty where she alleges that individuals on the board of directors failed to conduct proper oversight, received reports indicating a dire financial outlook, and disseminated incorrect information regarding the corporation's financial situation. The Court holds that Plaintiff fails to state a claim for breach of fiduciary duty. The Complaint lacks facts sufficiently demonstrating that the named defendants engaged in intentional misconduct or consciously failed to manage or oversee the corporation's internal monitoring systems. Accordingly, Defendants are entitled to dismissal for this reason as well.

## I. BACKGROUND

Plaintiff Shirley Morefield brings this breach of fiduciary duty action derivatively and on behalf of Nominal Defendant Computer Sciences Corporation ("CSC") against current and former CSC directors and officers. (Am. Compl. ¶ 1, Doc. 26.) Plaintiff brings this suit as a CSC stockholder. (*Id.* ¶ 14.) CSC is a Nevada corporation that provides information technology and business process outsourcing, consulting and systems integration services, and other professional services. (*Id.* ¶¶ 26, 35.) The named defendants are Irving W. Bailey, David J. Barram, Stephen L. Baum, Rodney F. Chase, Judith R. Haberkorn, Michael W. Laphen, Michael J. Mancuso, F. Warren McFarlan, Chong Sup Park, and Thomas H. Patrick ("Individual Defendants"), and Computer Sciences Corporation as a Nominal Defendant. (*See id.* at 1.)

Plaintiff's breach of fiduciary duty claim arises from a series of incidents occurring primarily between 2008 and 2012. During this time, CSC held a $5.4 billion contract with the United Kingdom's National Health Service ("NHS Contract") "to create a fully-integrated patient and medical records Information Technology system throughout the UK." (*Id.* ¶¶ 2, 36, 56.) Plaintiff alleges that "the Individual Defendants were responsible for disseminating numerous false and misleading statements concerning the Company's internal controls and profitability during the Company's fiscal years 2009-11." (*Id.* ¶ 42.) Many of these statements allegedly concerned the profitability of the NHS Contract, CSC's ability to fulfill the terms of the NHS Contract, and the adequacy and effectiveness of CSC's internal controls. (*Id.*) Plaintiff alleges that the Individual Defendants "knowingly caused or allowed the Company to issue" such misstatements "in press releases, Form 10-Q filings, Form 10-K filings, and conference calls from August 5, 2008 through August 11, 2010." (*Id.* ¶ 43.) The Complaint summarizes a non-exhaustive list of dates and forms containing misstatements but does not specify the contents of or attach a specific date to any particular misstatement. (*See id.*)

Plaintiff presents a series of allegations concerning public statements and events occurring no earlier than November 2010, whereby CSC made significant adjustments to financial outlooks, including adjustments in light of accounting errors and irregularities, reflecting the fact that CSC's "internal controls and procedures were not effective as of October 1, 2010." (*Id.* ¶¶ 44-49.) During this time the Securities Exchange Commission ("SEC") initiated a formal civil investigation into CSC's accounting practices. (*Id.* ¶ 47.) No later than February 2011, CSC initiated reviews and investigations of its internal controls. (*Id.* ¶ 49.) During 2011, CSC continued to release public documents reflecting its discovery of internal accounting errors while carefully refraining from commenting on the details of such errors in light of the SEC

investigation. (*Id.* ¶¶ 50-55.) CSC made further adjustments to financial projections, particularly those concerning the NHS Contract, in February and May of 2011. (*Id.* ¶¶ 56-57.) Company-wide revenue expectations declined by approximately $2 billion with respect to new business, while the value of the NHS Contract decreased in value by nearly $1 billion. (*See id.*)

Plaintiff further describes a series of internal communications allegedly sent in 2008 to Defendant Laphen and other individuals concerning the accounting inefficiencies in CSC's Nordic operations. (*Id.* ¶¶ 61-70.) Some of these letters stated the belief of certain individuals that the internal audit practice in the Nordic region posed a "significant risk to [] CSC" and that the chief audit executive "seriously compromised the integrity of the practice as well as the financials of this firm." (*Id.* ¶¶ 66-67.) Plaintiff also presents allegations concerning an internal review team and its belief that CSC would be unable to meet deadlines imposed by the NHS Contract. (*Id.* ¶ 72.) This review team—the DA Red Team—allegedly spent two weeks assessing projections related to the NHS Contract and concluded that, due to the project being behind schedule, CSC "could not deliver the solution set" required by the NHS Contract. (*Id.* ¶¶ 72-80.) This report was allegedly presented to the Board of Directors in May 2008. (*Id.* ¶ 80.) A second review team, commissioned in September 2008, concluded that some aspects of CSC's project made solid progress but ultimate delivery on schedule would be highly unlikely and test results were "abysmal." (*Id.* ¶¶ 81-83.)

Plaintiff alleges that CSC ultimately failed to timely deliver the programs required by the NHS Contract, causing a decline in the value of the NHS Contract. (*Id.* ¶ 86.) The withdrawal of the Penine Trust Foundation from the NHS program allegedly caused a cancellation of at least $175 million in revenue. (*Id.*) As of June 15, 2011, the value of the NHS Contract allegedly fell to $3.4 billion from $5.4 billion. (*Id.*) The failure to timely deliver the NHS Contract

requirements also led to a Parliamentary investigation in the United Kingdom, whereby Parliament concluded that CSC knew of the incapability of delivering on the contract by August 2008, if not earlier. (*Id.* ¶ 87.)

CSC faced a securities class action in this Court, filed in 2011. *See In re Computer Sciences Corp. Sec. Litig.*, No. 1:11-CV-610-TSE (E.D. Va. filed June 3, 2011). That action involved claims that the defendants in that case, which include some of the Individual Defendants, violated federal securities laws by knowingly disseminating the materially false and misleading statements identified by Plaintiff's Amended Complaint. (Am. Compl. ¶ 92.) On August 29, 2012, Judge Ellis granted in part and denied in part the defendants' motion to dismiss the class action, finding that Defendant Laphen "at least recklessly disregarded" findings that CSC could not perform its obligations.[1] (*See id.* ¶¶ 90, 93.)

On September 19, 2011, Plaintiff made demand on the Board of Directors to sue the Individual Defendants, the members of the Audit Committee in particular, for breach of fiduciary duty of loyalty and good faith. (*Id.* ¶ 97.) On November 1, 2011, counsel for the Board responded with a four-page letter informing Plaintiff that the Board refused her demand. (*See* Am. Compl. Ex. D.) The letter outlined the reasons for the refusal, including the impact on the pending SEC investigation and federal securities action, a pending internal investigation by the Audit Committee, and a cost-benefit analysis of a potential recovery in light of the costs of bringing and defending the Individual Defendants in such a suit. (*See id.*) On September 25, 2012, Plaintiff, through counsel, again made demand on the Board to reevaluate its November 2011 letter, in light of Judge Ellis's partial denial of the motion to dismiss, and sue the Individual Defendants. (Am.

[1] This class action remains pending, although the Court has preliminarily approved a proposed class action settlement.

Compl. ¶ 101.) On October 31, 2012, Plaintiff received notice that her demand had once again been refused. (*Id.* ¶ 102.) The Board noted that the factors informing its previous decision remained relevant, perhaps more so in light of Judge Ellis's decision. (*See* Am. Compl. Ex. F.) Plaintiff alleges that the refusal was wrongful and improper, claiming that the Board failed to collect additional information necessary to make an informed decision. (Am. Compl. ¶ 103.)

Plaintiff filed this suit on December 20, 2012, asserting a claim for breach of fiduciary duty. (Doc. 1.) After Defendants' filed their initial motions to dismiss on March 18, 2013, Plaintiff filed her Amended Complaint on April 8, 2013. (Doc. 26.) Defendants' renewed their motions on April 17, 2013, with essentially the same arguments presented in their initial motions. (Docs. 40, 43.) Nominal Defendant CSC and Defendants Laphen and Mancuso primarily assert that Plaintiff fails to comply with the pre-suit demand requirements of Rule 23.1. (*See* Doc. 43.) The Individual Defendants, while incorporating the Rule 23.1 argument, primarily seek dismissal for failure to state a claim. (*See* Doc. 40.) The Court heard oral arguments on the motions on May 10, 2013 and took the matter under advisement. (Doc. 54.) The Court is now prepared to rule on the motions and offer its explanations therefor.

## II. STANDARD OF REVIEW

### *A. Dismissal Pursuant to Rule 23.1*

Federal Rule of Procedure 23.1 instills pleading requirements unique to shareholder derivate lawsuits. *See* Fed. R. Civ. P. 23.1. One such requirement entails pleading with particularity "that the plaintiff has made a demand on the board of directors to take the requested action or the reasons for not making the demand." *In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d 417, 430 (S.D.N.Y. 2010) (citing Fed. R. Civ. P. 23.1), *aff'd*, 415 F. App'x 285 (2d Cir. 2011). Pleading both the demand and the corporation's refusal to comply therewith is a

necessary precondition to bringing a shareholder derivative action. *See, e.g.*, *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96 (1991). While the rule stops short of imposing any requirements of the demand's dimensions or contents, a complaint must plead sufficient facts to allow the Court to find the existence of the demand itself and refusal thereof. *Gomes v. Am. Century Cos.*, 710 F.3d 811, 815 (8th Cir. 2013) (citing *Kamen*, 50 U.S. at 96 and *Halebian v. Berv*, 590 F.3d 195, 211 (2d Cir. 2009)).

Rule 23.1 "creates a federal standard as to the specificity of facts" necessary to demonstrate standing; "[i]t does not abridge, enlarge or modify any substantive right." *Halebian*, 590 F.3d at 204 (internal quotation marks and citations omitted). This particularity requirement imposes a heightened pleading requirement for federal derivative actions. *Id.* at 211; *Kanter v. Barella*, 489 F.3d 170, 180 (3d Cir. 2007). Rule 23.1 raises the "pleading standard higher than the normal standard applicable to the analysis of a pleading challenged under Rule 12(b)(6)." *Am. Int'l Group*, 700 F. Supp. 2d at 430 (quoting *Kernaghan v. Franklin*, No. 06 Civ. 1533, 2008 WL 4450268, at *3 (S.D.N.Y. Sept. 29, 2008)). Accordingly, "Rule 23.1 is not satisfied by conclusory statements or mere notice pleading." *Id.* (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). However, like a Rule 12(b)(6) motion, the plaintiff's allegations receive the benefit of a presumption of truthfulness, and the Court will accept as true well-pleaded allegations and draw all fair and reasonable factual inferences in the plaintiff's favor that flow logically from those facts. *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 457 (S.D.N.Y 2009) (citations omitted).

***B. Rule 12(b)(6) Failure to State a Claim***

A motion to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) should be granted unless the complaint "states a plausible claim for relief" under Rule 8(a). *Walters v.*

*McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). In considering a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor. *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). In addition to the complaint, the court may also examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). No assumption of truth attaches to those "naked assertions" and "unadorned conclusory allegations" devoid of "factual enhancement." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (citations omitted). Nor is the court obligated to assume the veracity of a pleading's legal conclusions drawn from the facts alleged. *Adcock v. Freightliner LLC*, 550 F.3d 369, 374 (4th Cir. 2008) (citing *Dist. 28, United Mine Workers of Am., Inc. v. Wellmore Coal Corp.*, 609 F.2d 1083, 1085-86 (4th Cir. 1979)).

The complaint must contain sufficient factual allegations, taken as true, "to raise a right to relief above the speculative level" and "nudge [the] claims across the line from conceivable to plausible." *Vitol*, 708 F.3d at 543 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The facial plausibility standard requires pleading of "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 554 (4th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). The complaint must present "'enough fact to raise a reasonable expectation that discovery will reveal evidence' of the alleged activity." *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (quoting *Twombly*, 550 U.S. at 556). Thus, in order to survive a Rule 12(b)(6) motion to dismiss, the complaint must present sufficient non-conclusory factual allegations to support reasonable inferences of the plaintiff's entitlement to relief and the

defendant's liability for the unlawful act or omission alleged. *See Francis v. Giacomelli*, 588 F.3d 186, 196-97 (4th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678-79 and *Gooden v. Howard Cnty., Md.*, 954 F.2d 960, 969-70 (4th Cir. 1992) (en banc)).

## III. ANALYSIS

The Court grants the motions and dismisses Plaintiff's claims for two reasons. First, Plaintiff fails to state with particularity wrongful refusal in accordance with Federal Rule 23.1. Second, Plaintiff fails to sufficiently allege facts plausibly demonstrating knowledge and intentional misconduct by the Individual Defendants sufficient to invoke either corporate officer liability under Nevada law or liability under the *Caremark* doctrine. The Court discusses each of these rulings in turn.

### A. Plaintiff Fails to Sufficiently Allege Wrongful Refusal of Her Demand

The Court holds that Plaintiff fails to allege sufficient facts with particularity to create a reasonable doubt that the Board of Directors failed to make an informed decision in refusing Plaintiff's demand to sue individual corporate officers.

The demand requirement in shareholder derivative suits emerges from the basic principle of corporate governance providing that the board of directors retains the power to direct a business's policies and actions. *Halebian*, 590 F.3d at 205 (citations omitted). This power includes decisions of whether to pursue lawsuits in the interest of the corporation or shareholders. *Id.* This principle operates hand-in-hand with the business judgment rule, which presumes that "the board made its decision 'on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company.'" *In re Merrill Lynch & Co., Inc., Sec., Derivative & Erisa Litig.*, 773 F. Supp. 2d 330, 345 (S.D.N.Y. 2011) (quoting *Spiegel v. Buntrock*, 751 A.2d 767, 774 (Del. 1990)).

As a threshold matter, the Court applies Nevada law in determining whether Rule 23.1's demand requirement is satisfied. In federal derivative shareholder suits, the state of incorporation defines the standard for evaluating sufficiency of demand allegations under Rule 23.1. *See, e.g.*, *Weinberg ex rel. BioMed Realty Trust, Inc. v. Gold*, 838 F. Supp. 2d 355, 357 (D. Md. 2012) (citing *Kamen*, 500 U.S. at 108-09). This is because "[t]he underlying demand requirement" is substantive rather than procedural.[2] *Halebian*, 590 F.3d at 204 (quoting *Kamen*, 500 U.S. at 96-97). In this case, CSC is a Nevada corporation. (Am. Compl. ¶ 26.) Accordingly, "the source of the demand requirement must be the law of" Nevada. *RCM Sec. Fund, Inc. v. Stanton*, 928 F.2d 1318, 1327 (2d Cir. 1991). In proceeding with its analysis, the Court remains mindful that Nevada looks to Delaware law on issues of corporate law, including the demand requirement. *Shoen v. SAC Holding Corp.*, 137 P.3d 1171, 1184 (Nev. 2006). Thus, the Court also considers application of the Rule 23.1 standard by Delaware courts.[3]

Under Nevada law, a shareholder retains standing to bring a derivative action only where she "sufficiently plead[s] compliance with the demand requirement." *Id.* at 1180. This may be satisfied by allegations demonstrating that either plaintiff is excused from making a demand that would be futile or that she made demand and the board wrongfully refused her demand to take action. *See, e.g.*, *Levine v. Smith*, 591 A.2d 194, 212 (Del. 1991), *overruled on other grounds by*

[2] This rule harkens back to the well-settled *Erie* doctrine and its requirement that federal courts sitting in diversity apply the substantive law of the state to any claim which has its source in state law. *See, e.g.*, *Halebian*, 590 F.3d at 204 (citations omitted).

[3] Delaware state courts addressing pre-suit demand requirements typically apply Delaware Chancery Court Rule 23.1, a rule materially similar, and thus analogous, to Federal Rule of Civil Procedure 23.1. *See McCall v. Scott*, 239 F.3d 808, 815 (6th Cir. 2001); *Stepak v. Addison*, 20 F.3d 398, 402 (11th Cir. 1994); *Blasband v. Rales*, 971 F.2d 1034, 1052 (3d Cir. 1992); *Grogan v. O'Neil*, 307 F. Supp. 2d 1181, 1190 n.16 (D. Kan. 2004); *Salitz v. Nasser*, 208 F.R.D. 589, 592 (E.D. Mich. 2002). Thus, its treatment by Delaware state courts is instructive in ascertaining and applying the pre-suit demand requirement of its federal counterpart.

*Brehm v. Eisner*, 476 A.2d 244 (Del. 2000). "A shareholder's failure to sufficiently plead compliance with the demand requirement deprives the shareholder of standing and justifies dismissal of the complaint." *Shoen*, 137 P.3d at 1180.

Compliance with Rule 23.1's demand requirement here imparts on Plaintiff the burden of demonstrating wrongful refusal, rather than circumstances excused her from pleading demand at all. "A shareholder who makes a demand can no longer argue that demand is excused." *Spiegel*, 751 A.2d at 775 (citation omitted). Accordingly, Plaintiff here may only challenge the Board's refusal to act. In a wrongful refusal scenario, the only issues for courts to consider are the good faith and reasonableness of the Board's investigation. *Levine*, 591 A.2d at 212 (quoting *Spiegel*, 571 A.2d at 777). While the business judgment rule creates a presumption that the Board made an informed decision, Plaintiff may rebut such presumption of deference by pleading particularized facts that create a reasonable doubt that the Board was informed and validly exercised its business judgment. *Grimes v. DSC Commc'ns Corp.*, 724 A.2d 561, 565 (Del. Ch. 1998) (citing *Scattered Corp. v. Chicago Stock Exch.*, 701 A.2d 70, 73 (Del. 1997)); *Levine*, 591 A.2d at 205-06; *cf. Brehm*, 746 A.2d at 255 (Del. 2000) (explaining that a stockholder may control a suit only where reasonable doubt is created as to either the independence of the corporation's decisionmakers or that the business judgment rule protects the challenged decision). Although this reasonable doubt standard initially arose in the context of demand futility, Delaware law applies this heightened pleading requirement to wrongful refusal situations as well, as both situations are subject to a rebuttal of the business judgment rule and its protections of corporate decisions. *Levine*, 591 A.2d at 210-11 (rejecting a lenient pleading standard requiring merely "legally sufficient reasons for questioning the validity of a board's judgment" and explaining that the "reasonable doubt" pleading standard applies equally to allegations of demand futility and wrongful refusal of

demand); *see also In re General Motors Class E Stock Buyout Sec. Litig.*, 790 F. Supp. 77, 80 (D. Del. 1992) (citing *Levine*, 591 A.2d at 211) (noting that a plaintiff alleging wrongful refusal of demand can only survive a motion to dismiss for failure to meet the demand pleading of Rule 23.1 where the complaint "contain[s] 'well-pleaded allegations of fact which create a reasonable doubt that a board of directors' decision is protected by the business judgment rule"). The burden of demonstrating that a board's decision was in bad faith or unreasonable is a "considerable" one, presenting an obstacle that "few, if any, plaintiffs surmount." *RCM Sec. Fund*, 928 F.2d at 1328 (applying Delaware law).

The Court finds that Plaintiff fails to plead with particularity facts that create a reasonable doubt as to the validity of the Board's exercise of judgment. To begin, Plaintiff's Amended Complaint appears to rest primarily upon the conclusory allegation that the Board's refusal of her demand was "wrongful and improper." (*See* Am. Compl. ¶ 103.) Such legal conclusions will not be accepted as sufficient to withstand a motion to dismiss. *See, e.g.*, *Adcock*, 550 F.3d at 374 (citation omitted).

Even in her attempts to explain her conclusion, Plaintiff fails to create a reasonable doubt as to the whether the Board was informed in its decisionmaking. In response to her first demand, the Board explained its meeting to discuss her demand letter, the participants of the meeting, the retention of outside counsel whose sole affiliation with CSC was for purposes of reviewing her demand, the topics discussed at the meeting, and the various reasons for refusal in November 2011.[4] (*See* Am. Compl. Ex. D.) The topics discussed included (1) the Board's fiduciary duties in connection with her demand; (2) available alternatives to suit; (3) the likelihood of success in asserting the proposed claims; (4) damages recoverable in the event of a successful suit against the

[4] The Board's initial refusal, dated November 1, 2011, is attached to this Opinion as Appendix A.

corporate officers; (5) costs of pursuing the proposed claims, including legal fees incurred by both the corporation and potential defendants, as CSC's bylaws included an indemnification clause; (6) the potential commitment of corporate resources to such a suit; (7) the potential impact that a lawsuit might have on a contemporaneous SEC investigation; (8) the potential impact on a pending securities fraud action in this Court; and (9) other unnamed factors that the Board deemed relevant. (*Id.*) The Board's November 2011 refusal further explained which factors weighed heavily in favor of refusal: (1) the negative impact on the securities fraud litigation and SEC investigation and (2) "the reality that more will be known concerning the claims sought in the Demand, before statutes of limitations expire." (*Id.*) The refusal letter continued by explaining the Board's impression of the potential effect on these investigations that would result from pursuit of Plaintiff's demand, as well its position that future discoveries resulting from these proceedings and the Audit Committee's investigation should be considered before taking the action suggested in her demand. (*Id.*) The inclusion of these various factors, and explanations of their significance, belies Plaintiff's claim that the Board failed to make an adequately informed decision.

The Court finds the detail of the Board's November 2011 letter comparable to the detail presented before the Southern District of New York in the *Merrill Lynch* action, where the court rejected the plaintiff's wrongful refusal argument. In that case, the court found conclusory the plaintiff's "contention that the [] Board acted in bad faith and undertook no investigation of her claims." *Merrill Lynch*, 773 F. Supp. 2d at 347. In contrast to her position, the court noted that the plaintiff's reliance on the refusal letter plainly contradicted her assertions. *Id.* Notably, the court initially cited the letter's indication that the board relied on "the potential adverse effect of pursuing the claims outlined in [the demand] letters on the defenses of [Merrill Lynch] in certain

pending litigation and governmental inquiries," as well as a securities class action lawsuit. *Id.* at

348. The court emphasized that the board in that case already had an opportunity to consider the

plaintiff's claims in light of "this background of numerous proceedings and allegations." *Id.*

Furthermore, the *Merrill Lynch* court observed that the board's refusal cited a cost-benefit analysis

regarding claimed damages in the pending litigations, the likelihood of recovering damages from

the accused Merrill Lynch officers, and the effect of the corporation's internal laws requiring

exculpation of officers from liability in certain circumstances. *Id.* Also relevant to the court's

discussion was the refusal letter's mention of the plaintiff's intent to sue under a corporate

mismanagement theory that has been characterized as "possibly the most difficult theory in

corporation law upon which a plaintiff might hope to win a judgment."[5] *Id.* at 348-49. As a result

of these explanations, the Southern District of New York, applying Delaware law, deemed

conclusory plaintiff's allegations and held that the complaint failed to overcome the presumption

of the business judgment rule. *Id.* at 349. The similarities to the issue currently before the Court

are striking, as both boards cited pending securities litigation, alleged damages, and the costs of

indemnifying or exculpating corporate officers. These considerations, spelled out clearly for

Plaintiff and her counsel to understand, simply cannot be ignored when determining the validity of

the Board's exercise of business judgment. *Cf. In re Consumers Power Co. Derivative Litig.*, 132

F.R.D. 455, 485-86 (E.D. Mich. 1990) (finding proper a decision to not sue where the board of

directors, after assuming the validity of the shareholder's claims, conducted a cost-benefit analysis

weighing the amount of a potential derivative judgment against potential losses and effects on

other securities litigation and an SEC investigation).

---

[5] The Court will addresses this same theory, known as the *Caremark* doctrine, and its applicability
to Plaintiff's claims when considering Defendants' 12(b)(6) Motion.

Furthermore, the Court declines to adopt Plaintiff's argument that the Board's second refusal failed to sufficiently set forth additional facts or investigations supporting a second refusal. In *Merrill Lynch*, the court found unpersuasive the fact that a second refusal letter failed to mention the time spent considering the plaintiff's claims because the board had already considered and rejected a similar demand more than twelve months prior. *Merrill Lynch*, 773 F. Supp. 2d at 349. In the same manner here, it is reasonable to find that the Board was informed by its previous considerations and the information available at the time of Plaintiff's first demand.[6] *Cf. Halpert Enters., Inc. v. Harrison*, No. 06 Civ. 2331, 2007 WL 486561, at *5 (S.D.N.Y. Feb. 14, 2007) (holding that references to prior investigations does not amount to gross negligence demonstrating wrongful refusal). The fact that one factor in the Board's decision—the securities class action—had been affected since the time of the first refusal does not demonstrate that the Board was less informed at the time of the second demand than at the time of the first. Indeed, the change cited by Plaintiff in her second letter—the fact that the defendants' motion to dismiss was denied in part—did not bring a conclusive resolution to the matter and therefore may not have been sufficient to abate the concerns present at the time of the Board's first refusal.

The Court's reliance on the Board's refusal letters as indicative of Plaintiff's failure to satisfy Rule 23.1 is further supported by the District of Delaware's decision in *In re General Motors Class E Stock Buyout Securities Litigation*, a case cited by both parties. Defendant argues that this case supports its position that the Court may and should rely on the contents of the refusal letter as indicative of the Board's review of the shareholder's demand. (Defs.' Mem. Supp. Mot. Dismiss at 17, Doc. 44.) Plaintiff says that the case can be distinguished because the letter in that

---

[6] The Board's second refusal letter, dated October 31, 2012, is attached to this Opinion as Appendix B.

case explicitly stated that the board in that case specifically reviewed the matter at issue before taking action. (Pl.'s Opp'n at 15, Doc. 50.) The District of Delaware held that the plaintiff failed to satisfy the demand requirement where the board's refusal letter, attached to the complaint, indicated that the board "did review the matters at issue before they acted." *General Motors*, 790 F. Supp. at 81. The court explained that the plaintiff's conclusory allegations that the board failed to conduct an adequate inquiry were undermined by the contents of the board's letter. *Id.* Notably, the court arrived at this ruling after re-argument on the motion in light of the *Levine* decision and its holding that a plaintiff must present factual allegations creating a reasonable doubt as to the applicability of the business judgment rule. *Id.* at 79-80. On re-argument, the court found appropriate the consideration of the contents of the board's letter, which was not considered in the pre-*Levine* ruling where the court found the demand requirement satisfied. *Id.* at 81. Furthermore, the first ruling did not apply the pleading specificity requirement of Rule 23.1. *Id.*

The holding in *General Motors* supports Defendants' contention that Plaintiff here failed to satisfy the demand requirement. The Board's November 2011 letter demonstrated that the matters were considered prior to voting on whether to take action on Plaintiff's demands. Plaintiff's conclusory allegations, when compared with the contents of the Board's letter, do not demonstrate the Board acted in an uninformed manner. *Cf. id.* (holding that the plaintiffs' "conclusory allegations concerning refusal of the demand with equally conclusory allegations concerning approval of the underlying transaction" failed to displace the business judgment rule's application because the "[General Motors] Board's refusal letter indicate[d] that the directors did review the matters at issue before they acted"). Just as in *General Motors*, Plaintiff's conclusory allegations are inconsistent with the principles set forth in *Levine* governing demand requirements. *Id.* Plaintiff's citation to *General Motors* directly undermines her position, as she attached the

Board's four-page letter to her Complaint, wherein the Board expands upon the various reasons for refusal.

*General Motors* also undermines another one of Plaintiff's arguments, where she attempts to distinguish Defendants' actions from those in *Merrill Lynch* and *Mount Moriah Cemetery v. Moritz*, No. 11431, 1991 WL 50149 (Del. Ch. Apr. 4, 1991). Defendants cite these cases for the position that Plaintiff presents insufficient conclusory allegations that fail to counter the Board's refusal letter. (Defs.' Mem. Supp. Mot. Dismiss at 16.) Plaintiff argues these cases are distinguishable because they involved the creation of special committees with the sole purpose of investigating the shareholders' respective demands. (Pl.'s Opp'n at 14-15.) However, *General Motors* explicitly notes there is "no requirement that [a] [b]oard establish a special committee in a demand refused situation." 790 F. Supp. at 81.

The Court agrees with the position in *General Motors*, finding that nothing in the parties' arguments indicates that a special committee is required for a board of directors to reap the effects of the business judgment rule. As courts applying Delaware business judgment principles recognize, "[t]here is 'no prescribed procedure that a board must follow' for investigation a shareholder demand." *In re Bank of Am. Corp. Sec., Derivative, & Erisa Litig.*, No. 12 Civ. 4568, 2013 WL 1777766, at *7 (S.D.N.Y. Apr. 25, 2013) (quoting *Levine*, 591 A.2d at 214). Accordingly, the Court will not find that such a committee is a rigid requirement, necessary to invoke the protections of the business judgment rule, with which Defendants failed to comply.[7] While a special committee may be prudent in the eyes of some decisionmakers, nothing before the Court demonstrates that such a committee is a prerequisite to reaching an informed decision. As a

[7] The Court notes that the Board did employ special counsel for the purpose of considering Plaintiff's demands; whether this special counsel is equivalent to the type of special committee Plaintiff argues is necessary is of no consequence to the Court's decision.

result, the Court finds that Defendants' protection by the business judgment rule is not eroded by the fact that the Board did not specifically indicate its designation of a special committee to handle Plaintiff's demand.

In much the same manner, the Court finds unpersuasive Plaintiff's attempt to craft inferences of doubt by challenging certain aspects of the Board's process. Because "[t]here is 'no prescribed procedure that a board must follow,'" the Court declines Plaintiff's invitation to use the timespan between the demand letter and the Board's meeting as a reason for invalidating their decision, especially in light of the aforementioned reasons. *See Bank of Am.*, 2013 WL 1777766, at *7 (quoting *Levine*, 591 A.2d at 214). The amount of time that elapsed between the first demand letter and the meeting to discuss the letter does not necessarily demonstrate a failure to be reasonably and adequately informed. In her opposition, Plaintiff argues that in the nearly one-month timespan between these two events, the Board failed to conduct any investigation either directly or through counsel. (Pl.'s Opp'n at 11, Doc. 50). However, the allegation that no factual investigation occurred is absent from the Complaint. (*See* Am. Compl. ¶ 103.)

Notwithstanding this omission, the Court finds that it is not a fair and logical inference to say that no factual investigation was conducted by the Board or its counsel during this time, in light of what may have already been known or under consideration as a result of pending litigation and government investigation. Furthermore, Plaintiff's argument—unsupported by an allegation in the Amended Complaint—that the Board made its decision "in a matter of minutes" does not compel a finding of unreasonableness. Even assuming the Board met for a period of one hour or shorter, that fact, by itself, "fails to vitiate the reasonableness of the Board's investigation, or the deference to which that investigation is entitled," as corporate directors tend to have limited time to devote to deliberation. *In re Boston Scientific Corp. S'holders Litig.*, No. 02 Civ. 247, 2007

WL 1696995, at *6 (S.D.N.Y. June 13, 2007) (citing *Levine*, 591 A.2d at 214) (rejecting the plaintiff's argument that board of directors' review was inadequate as a result of the fact that the board "met for only one hour to discuss [p]laintiffs' demand and agree upon" a course of action).

The Court also rejects Plaintiff's argument that the Board's decisions were imprudent or otherwise tainted by the reliance on the Audit Committee's investigation or counsel. Plaintiff contends that the Board's failure to specifically disclose any other investigation indicates that the Board conducted no other investigation or relied upon any separate investigation. (Pl.'s Opp'n at 13-14.) Plaintiff relies on the Eleventh Circuit's decision in *Stepak v. Addison*, 20 F.3d 398 (11th Cir. 1994), holding that a board cannot effectuate its duties in good faith, and thus commits gross negligence, where it entrusts its investigation to a law firm that represented the alleged wrongdoers in related proceedings. *Id.* at 405. The Court certainly does not doubt the Eleventh Circuit's contention that "it is axiomatic" that this sort of conduct would not be in good faith. *See id.* However, the comparison is inapposite here. The alleged wrongdoers in this case are represented by the Skadden Arps Slate Meagher & Flom law firm in related proceedings before this Court; however, the Board retained another firm—Weil, Gotshal & Manges LLP—in relation to the demand considerations. (*See* Am. Compl. Ex. B.) Thus, the firm advising the Board is not in the position presented in *Stepak.*

Furthermore, *Stepak* analyzed the conflicted firm's influence to the extent that such influence "dominated" the board's consideration in that case. *See id.* at 404-05. Nothing in the Amended Complaint or attached exhibits indicate that Skadden, the firm representing the defendants in the securities actions, simultaneously handled the defense of the Individual Defendants here while conducting an allegedly neutral investigation into Plaintiff's claims that dominated the Board's decision. *See Stepak*, 20 F.3d at 405. Here, the investigations cited in the

Board's letter included not only the Audit Committee's investigations but also that of the Securities Exchange Commission as well as discovery conducted in the federal securities litigation suit. While members of the Skadden firm were present at the Board's meeting for the purpose of presenting information related to Plaintiff's demand, the Board was advised by a firm other than Skadden. Accordingly, it cannot be said that the Board's decision was dominated by the investigation of a conflicted party similar to the situation in *Stepak*.

For these reasons, the Court finds that, in light of the reasons presented in the Board's November 2011 letter and the October 2012 letter's reliance on continued presence of those reasons, Plaintiff fails to sufficiently plead particularized facts demonstrating the Board wrongfully refused her demand. Accordingly, the Court grants the motion to dismiss for failure to comply with Rule 23.1.

**B. Plaintiff Fails to State a Claim for a Breach of Fiduciary Duty**

In the alternative to Plaintiff's failure to comply with Rule 23.1, the Court holds that Plaintiff fails to state a claim for a breach of fiduciary duty. The parties dispute whether Plaintiff adequately states a claim under either a Nevada statute or the *Caremark* doctrine, a theory of liability first formulated in Delaware corporate law. The Court analyzes each in turn, finding Plaintiff's allegations insufficient under either standard.

*1. Liability Under Nevada Law*

Breach of fiduciary duty under Nevada law requires (1) the existence of a fiduciary duty, (2) a breach, and (3) the breach proximately caused damage. *See, e.g.*, *Brown v. Kinross Gold U.S.A., Inc.*, 531 F. Supp. 2d 1234, 1245 (D. Nev. 2008). However, Nevada statutory law limits individual liability for such breaches to only those situations where (1) the act or omission constitutes a breach of the individual's fiduciary duty and (2) the breach "involve[s] intentional

misconduct, fraud or a knowing violation of the law." Nev. Rev. Stat. § 78.138(7); *Shoen*, 137 P.3d at 1184. Thus, because Plaintiff seeks relief against the Individual Defendants as officers or directors of CSC, her allegations must demonstrate the Individual Defendants' intentional misconduct, fraud, or knowing violation of the law. *See, e.g., La. Mun. Police Empl. Ret. Sys. v. Wynn*, No. 2:12-CV-509, 2013 WL 431339, at *6 n.8 (D. Nev. Feb. 1, 2013).[8]

Here, Plaintiff fails to allege facts giving rise to intentional misconduct, fraud or a knowing violation of the law. At best, the Amended Complaint presents allegations describing the opportunities to learn that CSC faced potential problems fulfilling its contract in a timely and profitable manner. However, even those allegations are not presented in a way that establishes either knowledge on the part of each Individual Defendant or their intentional misconduct. Paragraphs 42 and 43 present summaries of dates upon which the Individual Defendants allegedly caused or allowed CSC to issue misleading and false information. These allegations do not present facts demonstrating the content of the false statements and that the author of such statement intended to mislead shareholders or others about the information contained within the various press releases and filings. Nor does the Amended Complaint demonstrate sufficient pleadings of fraud, which require specific allegations as to "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999). The Amended Complaint also fails to indicate that the Individual Defendants each knew how their conduct would violate the governing law.

---

[8] The particulars of these statutory parameters diminish Plaintiff's reliance on Delaware cases to the extent those cases do not consider Nevada's heightened requirement for individual liability.

Even assuming the Board members were aware that certain aspects of the NHS Contract were behind schedule and that test results fell short of the expected level of quality at the time, the Amended Complaint fails to demonstrate conduct by the Individual Defendants indicative of intentional misconduct or falsehoods regarding future expectations of the contract. For example, Defendant Laphen allegedly stated, after learning of missed deadlines, that the company's confidence in the program was building and that they were pleased with the progress. (Am. Compl. ¶ 85.) Knowing that the company was behind on certain tasks does not suddenly transform any statement expressing confidence in future returns into intentional misconduct.

Plaintiff's reliance on the conclusions of other investigations does not support her argument that she sufficiently states a claim. The fact that filings in 2011 reflected a lowering of fiscal projections (*see id.* ¶¶ 56-59), does not demonstrate actual knowledge during the alleged period of false statements in 2008-10. (*See id.* ¶¶ 42-43.) Furthermore, Plaintiff's reliance on Judge Ellis's findings in a related securities fraud case do not demonstrate intent, as Judge Ellis held, according to the Amended Complaint, that Defendant Laphen's conduct was "at least reckless[.]" (*Id.* ¶¶ 89-90.) Recklessness is not intent, thus this finding cannot in and of itself demonstrate intentional misconduct in violation of their fiduciary duties.

For these reasons, Plaintiff fails to state a claim that would invoke individual liability for corporate officers and directors under Nevada law.

*2.* Caremark *Doctrine Liability*

The Court also finds that Plaintiff fails to state a claim pursuant to the *Caremark* doctrine, a corporate mismanagement theory set forth in *In re Caremark International Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996). The *Caremark* doctrine "contends that the directors set in motion or 'allowed a situation to develop and continue which exposed the corporation to enormous legal

liability and that in doing so they violated a duty to be active monitors of corporate performance.'" *South v. Baker*, 62 A.3d 1, 14 (Del. Ch. 2012) (quoting *Caremark*, 698 A.2d at 967). Thus, *Caremark* requires "a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists." *Id.* at 15 (quoting *Caremark*, 698 A.2d at 971). It is this sort of failure that "establish[es] the lack of good faith that is a necessary condition to liability." *Id.*

Director oversight liability under *Caremark* arises where either (1) "the directors utterly failed to implement any reporting or information system or controls" or (2) "having implemented such a system or controls, [the directors] failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (citing *Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003)). Courts have routinely recognized, as early as the court in *Caremark*, that this theory "is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *Caremark*, 698 A.2d at 967; *see also Stone*, 911 A.2d at 372 (quoting *Caremark*, 698 A.2d at 967); *see also South*, 62 A.3d at 25 ("*Caremark* claims are difficult to plead and harder to prove."). The heavy burden of pleading a *Caremark* claim has been described as "rightly onerous," so as to maintain the necessary force of the business judgment rule and its protection of corporate management decisions made in good faith. *Teachers' Ret. Sys. of La. v. Aidinoff*, 900 A.2d 654, 668 (Del. Ch. 2006) (citations omitted).

Here, the Court finds that Plaintiff fails to allege facts demonstrating an utter failure to implement a monitoring system or oversee such system. Plaintiff cannot proceed on the theory that no oversight system existed, as she acknowledges the presence of the Audit Committee and "multiple high-level investigations into the Company's internal controls and accounting

practices." (Pl.'s Opp'n at 23, Doc. 51.)  Thus, she may only succeed by pleading that the

Individual Defendants "consciously failed to monitor or oversee [the system's] operations."

*Stone*, 911 A.2d at 370.  This she fails to do, as the allegations do not demonstrate any sort of

conscious failure to disregard.  The Amended Complaint alleges that Defendant Laphen learned in

2008 that the internal audit practice posed a significant risk to the company, yet this alone will not

demonstrate a conscious disregard of his fiduciary duty.  Absent are allegations that each

Individual Defendant actually knew of this letter or any deficiencies—the Amended Complaint

seems to limit this knowledge to Laphen and those Defendants who were on the Audit Committee.

(*See* Am. Compl. ¶¶ 61-63, 66.)  Furthermore, the Amended Complaint does not show that

Laphen's actions demonstrated a conscious failure to oversee or address known, as opposed to

speculative, weaknesses.

     Plaintiff's allegations fall far short of painting the picture of a conscious breach "so

persistent that it could not be ascribed to anything other than a knowing decision not to even try

to" develop and implement a system for legal compliance.  *Desimone v. Barrows*, 924 A.2d 908,

935 (Del. Ch. 2007).  The Amended Complaint alleges that in November 2010, Mr. Mancuso

indicated that accounting irregularities had been discovered.  Mr. Mancuso allegedly

acknowledged the existence of the errors and noted that such irregularities were "behind us."

Upon the February 2011 discovery of further irregularities, Mr. Mancuso explained that the

corporation was investigating these additional accounting errors and losses.  The Amended

Complaint quotes Mr. Mancuso as saying that the financial operations in question were being

"turned . . . upside down" and that "a very large team of in-house and out-of-house experts

examined every contract . . . and every line item on the balance sheet" relevant to CSC's Nordics

operation.  (Am. Compl. ¶ 50.)  The allegations later cite various announcements that explain how

certain deficiencies in accounting were discovered in 2010 but the company did not determine a material weakness in the system until 2011, the same time during which Mr. Mancuso acknowledged a comprehensive review of the accounting controls.

The existence of deficiencies in the internal audit practice does not equate to the Board members being conscious of a failure to do their jobs. *Cf. Guttman v. Huang*, 823 A.2d 492, 506 (Del. Ch. 2003). Nor will the Board's acknowledgement of such errors preclude dismissal of a *Caremark* claim; *Caremark* liability here requires a conscious failure to monitor of the sort that "disabl[es] themselves from being informed of risks or problems requiring their attention." *Stone*, 911 A.2d at 370. Here, the allegations demonstrate the opposite: the Board operated in such a manner that it was in position to learn of risks and problems with accounting and other internal controls. Furthermore, when the Board suspected a material weakness in the accounting practices, their course of action, as described by Mr. Mancuso, could hardly be described as "conscious torpor in the face of duty." *Aidinoff*, 900 A.2d at 668. Unlike one who knowingly and consciously turns a blind eye to their duties, the Board imposed a thorough review of their financial and accounting practices related to those operation as the center of CSC's financial irregularities. Considering the entirety of the allegations and actions taken by the Board upon discovery of significant and material accounting errors, the Court does not find that the Individual Defendants exhibited "persistent shirking and conscious inattention to duty." *In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 653 (Del. Ch. 2008) (citing *Aidinoff*, 900 A.2d at 668). Accordingly, Plaintiff fails to carry the "onerous" burden of sufficiently pleading a claim under the most difficult theory of corporate management liability.

As a final note, Plaintiff's reliance on *Rich ex rel. Fuqi International, Inc. v. Yu Kwai Chong*, 66 A.3d 963 (Del. Ch. 2013), will not convince the Court that the claims survive a Rule

12(b)(6) motion. The court in *Fuqi* indeed found sufficient a plaintiff's *Caremark* allegations despite the difficulty of sufficiently pleading such a claim. However, the *Fuqi* allegations were considered under a Delaware's Court of Chancery Rule 12(b)(6), which applies a "reasonable conceivability" standard. *Id.* at 980. Considering the federal pleading requirement that allegations must push the right to relief "across the line from conceivable to plausible," a "reasonable conceivability" standard falls below the pleading requirement necessary to state a claim in federal court. *See Twombly*, 550 U.S. at 555, 570. Adopting the holding of a court using reasonable conceivability, a lesser standard than plausibility, would be inappropriate here. Thus, the Court is not persuaded that *Fuqi* supports Plaintiff's position and requires denial of Defendants' Motion here.

For these reasons, the Court grants the Individual Defendants' Motion to Dismiss, as Plaintiff fails to allege sufficient facts plausibly demonstrating corporate officer liability under either Nevada law or the *Caremark* doctrine.

**C. Leave to Amend**

Whether to dismiss with prejudice is within the discretion of the court. *See, e.g.*, *Carter v. Norfolk Cmty. Hosp. Ass'n*, 761 F.2d 970, 974 (4th Cir. 1985). As a general matter, leave to amend is to be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Accordingly, some courts find harsh a dismissal with prejudice where a complaint fails to satisfy the particularity requirement of Rule 23.1. *See In re Abbott Depakote S'holder Derivative Litig.*, 909 F. Supp. 2d 984, 1000 (N.D. Ill. 2012). Of course, courts heed the Supreme Court's instruction that leave to amend should be refused only in situations of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to a defendant, or futility of amendment. *See Glazer v. Enzo Biochemical, Inc.*, 126 F. App'x 593, 602 (4th Cir. 2005) (quoting *Forman v. Davis*, 371

U.S. 178, 182 (1962)). Accordingly, where amendment is futile, courts have exercised their discretion to deny leave to amend and dismiss with prejudice. *See Sprando ex rel. Int'l Game Tech. v. Hart*, No. 3:10-CV-415-ECR-VPC, 2011 WL 3055242, at *4-5 (D. Nev. July 22, 2011) ("Plaintiff's failure to show that his demand on the Board of Directors was wrongfully refused cannot be remedied by an amended complaint, and therefore, Plaintiff's suit must be dismissed in its entirety with prejudice."); *cf. Abbott*, 2012 WL 5561268, at * 13 (granting leave to amend where "the court has not previously ruled on whether the Plaintiffs adequately alleged demand futility" and "now that the court has described the deficiencies in the complaint, Plaintiffs may be able to correct those deficiencies by pleading additional facts they did not include here").

The Court exercises its discretion to deny leave to amend, as any amendment would be futile in meeting the Rule 23.1 requirement. During oral argument, the Court inquired of Plaintiff's counsel whether there were any additional facts related to demand that are not before the Court in the Amended Complaint. Plaintiff's counsel indicated that the facts considered above and contained within the briefs present the entirety of the circumstances surrounding Plaintiff's demand on the Board. Being that the Court has deemed the allegations insufficient and Plaintiff cannot retroactively fulfill the requirements as to refusals that have already occurred, the Court finds that amendment would be futile. Accordingly, the Court dismisses the Amended Complaint with prejudice.

## IV. CONCLUSION

The Court grants the Motions to Dismiss Plaintiff's verified Amended Complaint. Plaintiff failed to satisfy Rule 23.1 pre-suit demand requirement because the allegations do not create a reasonable doubt as to whether the Board was sufficiently informed in its decisionmaking and validly exercised its business judgment. Plaintiff also fails to state a claim under either Nevada

law, because the allegations do not demonstrate intentional misconduct in knowing violation of the law, or the *Caremark* doctrine because the allegations do not present utter disregard or conscious failure to monitor. For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motions to Dismiss are **GRANTED**. Having determined that Plaintiff has pleaded all facts relevant to her demand and the Board's refusal thereof, the Court finds any amendment would be futile. Accordingly, Plaintiff's Amended Complaint is **DISMISSED with prejudice**.

The Clerk of the Court is directed to close this case.

**IT IS SO ORDERED.**

ENTERED this 6th day of August, 2013.

Alexandria, Virginia
8 / 6 / 2013

/s/
Gerald Bruce Lee
United States District Judge

# APPENDIX A

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Stephen A. Radin
+1 (212) 310-8770
stephen.radin@weil.com

November 1, 2011

BY E-MAIL (ezagar@ktmc.com)

Eric L. Zagar
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087

Re: Computer Sciences Corporation Shareholder Demand

Dear Eric:

I write in response to your August 15, 2011 and September 19, 2011 letters on behalf of Howard Coffin and Shirley Morefield demanding that the Board of Directors of Computer Sciences Corporation ("CSC") cause CSC to commence litigation on behalf of CSC asserting the claims stated in your letters against the CSC directors and officers named in the letters (the "Demand"). For the reasons stated below, CSC's Board has determined to refuse the Demand at this time.

CSC's Board includes 10 directors: Irving W. Bailey, II, David J. Barram, Stephen L. Baum, Erik Brynjolfsson, Rodney F. Chase, Judith R. Haberkorn, Michael W. Laphen, F. Warren McFarlan, Chong Sop Park and Thomas H. Patrick. 9 of these 10 directors (all but Mr. Laphen, CSC's Chairman, CEO and President) are outside, non-management, non-employee directors.

Following receipt of the Demand, CSC's outside directors determined to retain independent counsel to advise the Board in connection with the Demand. Mr. Bailey, as lead director, and Mr. Baum interviewed three law firms on behalf of the Board. After consulting their colleagues, Messrs. Bailey and Baum retained Weil, Gotshal & Manges LLP. Weil does not represent CSC, except as independent counsel to the Board in connection with the Demand.

By letter dated October 5, 2011, I informed you that the Demand would be presented to the Board at its regularly scheduled meeting in October. My October 5, 2011 letter (like letters you received prior to Weil's retention from William L. Deckelman, CSC's Vice President and General Counsel) requested (1) documentation showing your clients' ownership of CSC shares during the period that your clients allege wrongdoing occurred through today, and (2) any specific factual information you or your clients have supporting the allegations in your letters and any additional information that you or your clients believe CSC's Board would find useful in evaluating your clients' demands. I received no response from you to my October 5, 2011 letter until this morning, when you sent me a redacted account statement showing that Ms. Morefield owns 35 shares of CSC stock and stating that you were still waiting for documentation from Mr. Coffin (who made his demand 2-1/2 months ago).

On October 17, 2011, the Board discussed the Demand, which had been sent to the Board before the meeting. The discussion included the Board, my partner Joseph S. Allerhand and I, Mr. Deckelman, M. Louise Turrilli, Vice President, Deputy General Counsel, and Assistant Secretary of CSC, and Jay B. Kasner and Scott D. Musoff of Skadden, Arps, Slate, Meagher & Flom LLP. Skadden is CSC's outside counsel in a federal securities law action against CSC (and Mr. Laphen and two additional officers of CSC) involving the same subject matter as the Demand, In re Computer Sciences Corp. Securities Litigation, No. 1:11-cv-00610-TSE-IDD (E.D. Va.) (the "Federal Securities Action").

Mr. Allerhand and I discussed and answered questions concerning the Demand, the litigation the Demand asks the Board to commence, the Board's fiduciary duties in connection with the Demand, the alternatives available to the Board in responding to the Demand, and the factors boards may consider in exercising business judgment in connection with demands by shareholders that corporations assert litigation claims. Factors specifically noted include likelihood of success in asserting claims, damages recoverable in the event of success, costs of pursuing claims, including legal fees incurred by the corporation bringing the claims and legal fees incurred by individuals the corporation sues defending the claims (CSC's bylaws, like most public company bylaws, require CSC to indemnify directors, officers and employees for many potential liabilities and to advance defense costs to directors, officers and employees), corporate resources such as management time that would be devoted to the claims, the potential impact of pursuing claims on other litigations or proceedings, statutes of limitations, and any other factors a board deems relevant in the exercise of its business judgment.

Mr. Kasner discussed and answered questions concerning the claims and potential damage theories in the Federal Securities Action, and the potential impact of pursuing the claims stated in the Demand on the Federal Securities Action. Mr. Kasner also discussed and answered questions concerning an investigation being conducted by the Securities and Exchange Commission (the "SEC") involving the same subject matter as the Demand and the Federal Securities Action (the "SEC Investigation"), and the potential impact of pursuing the claims stated in the Demand on the SEC Investigation.

Ms. Turilli and Messrs. Laphen, Deckelman, Kasner and Musoff then left the meeting. A discussion followed, including only the Board's outside directors, Mr. Allerhand and me.

During this discussion, a tentative consensus emerged that two factors deserve overwhelming weight in the Board's consideration of the Demand and would heavily outweigh any considerations (if there were any) in favor of pursuing the claims stated in the Demand: (1) the potential negative impact on the Federal Securities Action and the SEC Investigation of pursuing the claims stated in the Demand, assuming for the sake of argument that the claims have merit, and (2) the reality that more will be known concerning the claims sought in the Demand, before statutes of limitations expire.

With respect to the potential impact on the Federal Securities Action and the SEC investigation of pursuing the claims stated in the Demand, the plaintiffs in the Federal Securities Action allege much of the same wrongdoing that is alleged in the Demand and seek far more in damages than could be collected in an action pursuing the claims stated in the Demand, assuming for the sake of argument that the claims have merit. Any action against the CSC directors and officers named in the

Demand would likely have a significant adverse impact on CSC's defense of the Federal Securities Action and might jeopardize meritorious defenses in that proceeding. Any action against the CSC directors and officers named in the Demand might also have an adverse impact on CSC's position in the SEC investigation. The Board concluded that none of these outcomes would serve the best interests of CSC and its shareholders.

With respect to additional facts that will be known in the future, before statutes of limitations expire, the Board concluded that much more likely will be known in the future concerning the events underlying the Demand, as the Federal Securities Action, the SEC Investigation and the Audit Committee's own internal independent investigation proceed. The Board believes that the outcomes of the Federal Securities Action, the SEC Investigation and the Audit Committee's internal investigation and the facts learned in that action and those investigations (including by highly motivated and incentivized adversaries in the Federal Securities Action and experienced government regulators in the SEC Investigation) should be considered before any determination is made to commence litigation asserting the claims stated in the Demand where, as here, statutes of limitations are not expiring in the near future.

The Board also considered, but attached less weight to, other factors, including the attorneys' fees that would be incurred in an action asserting the claims stated in the Demand. The Board also considered the fact that Ms. Morefield and your law firm have commenced a lawsuit against CSC, thus creating a conflict with respect to representation by your firm of CSC in the lawsuit sought in the Demand.

The Board, with Mr. Laphen still not in attendance, asked Mr. Allerhand and I to work with Mr. Bailey in his capacity as lead director to draft a letter responding to the Demand, stating the Board's conclusions and summarizing the Board's reasons for refusing the Demand at this time. The Board determined not to make a final decision with respect to the Demand until it reviewed the draft the Board had requested.

Following the October 17, 2011 meeting, a draft of this letter was prepared. On October 26, 2011, the draft was approved by Mr. Bailey, and then circulated to the Board. On October 30, 2011, the Board met telephonically, with Messrs. Laphen. Chase and Patrick not in attendance. Following discussion concerning the draft, the Board voted unanimously to refuse the Demand at this time, subject to Mr. Bailey's confirmation that Messrs. Chase and Patrick concurred, in a resolution reading as follows:

> RESOLVED, that Howard Coffin and Shirley Morefield, who identify themselves as shareholders of the Corporation, have demanded in letters from their counsel dated August 15, 2011 and September 19, 2011, respectively, that the Board cause the Corporation to commence litigation on behalf of the Corporation asserting the claims stated in those letters against the directors and officers of the Corporation named in those letters (the "Demand");

FURTHER RESOLVED, that the Board, at its meeting on October 17, 2011, considered, with the assistance of independent counsel, the facts and circumstances surrounding the Demand, including the claims in the Demand and the litigation sought in the Demand and the alternatives available to the Board in responding to the Demand, and, in the absence of Mr. Laphen, reached a tentative consensus that commencement of litigation asserting the claims stated in the Demand would not serve the best interests of the Corporation and its shareholders at this time, and that the Demand should be refused at this time;

FURTHER RESOLVED, that the Board, at its meeting on October 17, 2011, in the absence of Mr. Laphen, requested that independent counsel work with the Board's lead director to draft a letter refusing the Demand, stating the Board's conclusions and summarizing the Board's reasons for refusing the Demand at this time, and which the Board would review before making its final determination with respect to the Demand;

FURTHER RESOLVED that the Board, at its meeting on October 30, 2011, in the absence of Messrs. Laphen, Chase and Patrick, considered a draft letter prepared by independent counsel and the Board's lead director, which had been circulated to the Board prior to the meeting, refusing the Demand at this time and stating the Board's conclusions and summarizing the Board's reasons for refusing the Demand at this time; and

FURTHER RESOLVED that the Board, at its meeting on October 30, 2011, in the absence of Messrs. Laphen, Chase and Patrick, and after reviewing the draft letter, unanimously determined, subject to Mr. Bailey's confirmation that Messrs. Chase and Patrick concurred, that commencement of the litigation asserting the claims stated in the Demand would not serve the best interests of the Corporation and its shareholders at this time, that the Demand should be refused at this time, and that the draft letter circulated to the Board should be finalized in accordance with the Board's discussion and sent to Mr. Coffin and Ms. Morefield's counsel.

On November 1, 2011, Mr. Bailey informed me that he had conferred with Messrs. Chase and Patrick and that they each concurred.

Very truly yours,

Stephen A. Radin

# APPENDIX B

**Weil, Gotshal & Manges LLP**

767 Fifth Avenue
New York, NY 10153-0119
+1 212 310 8000 tel
+1 212 310 8007 fax

Stephen A. Radin
+1 (212) 310-8770
stephen.radin@weil.com

October 31, 2012

BY E-MAIL (ezagar@ktmc.com)

Eric L. Zagar
Kessler Topaz Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA  19087

Re:  Computer Sciences Corporation Shareholder Demand

Dear Eric:

Your September 25, 2012 letter asks that CSC's board of directors reconsider its October 30, 2011 determination (communicated to you in my November 1, 2011 letter) to refuse your clients' August 15, 2011 and September 19, 2011 demands.  In support of this request, you cite the court's decision granting in part and denying in part a motion to dismiss in In re Computer Sciences Corporation Securities Litigation, 2012 WL 3779349 (E.D. Va. Aug. 29, 2012), a federal securities law action against CSC and Messrs. Laphen, DeBuck and Mancuso.

The court's decision is a pleading decision that assumes the truth of the facts alleged and makes no determinations on the merits.  Accordingly, the board's principal reasons for refusing your clients' demands stated in my November 1, 2011 letter appear to be as applicable today – if not more applicable – as on November 1, 2011:  (1) the potential negative impact on the federal securities action (and an SEC investigation, which to the Company's knowledge is still not complete) of pursuing the claims stated in the demand, assuming for the sake of argument that the claims have merit, and (2) the reality that more will be known concerning the claims sought in the demand.

Please advise if you disagree with this view and, if so, why, and I will communicate your view to CSC's board.

Please also send me documentation concerning you clients' ownership of CSC stock during the period that your clients allege wrongdoing occurred through today.  In response to prior requests for this information, you sent me a redacted account statement showing that Ms. Morefield owned 35 shares of CSC stock in September 2011, but offered no documentation showing that

Eric L. Zagar
October 31, 2012
Page 2

Weil, Gotshal & Manges LLP

she owned shares before September 2011. You have sent me no documentation showing that Mr. Coffin is or ever has been a CSC shareholder.

Very truly yours,

Stephen A. Radin

2

US_ACTIVE:\44113222\1\38148.0003